Filed 7/15/15  P. v. Abston CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076982 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 12F000777, 13F05082) |
| v. | |
| BRENDON WADE ABSTON, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Brendon Wade Abston was convicted of home invasion robbery in concert (Pen. Code, §§ 211, 213, subd. (a)(1)(A))[1] and first degree residential burglary (§§ 459, 462, subd. (a), & 667.5, subd. (c)(21)).  The trial court found true allegations that defendant had been convicted of a prior residential burglary (§ 667, subds. (a)-(i)) and violated probation in an earlier case, and sentenced defendant to an aggregate term of 17 years in state prison.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

On appeal, defendant contends the trial court erred by admitting an audio recording of the victim's 911 call over his Evidence Code section 352 objection.

We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

Maleka Cummings lived with her grandmother, Jeanette Cummings, in a house on Bellamy Way in Sacramento. On the morning of July 30, 2013, Jeanette, a preschool teacher, left for work leaving 17-year-old Maleka home alone. A short time later, Maleka received a telephone call from defendant, a close friend who was like a brother to her.

Defendant told Maleka that he really wanted to come over to see her. However, Jeanette had a standing rule that Maleka was not allowed to entertain guests in the house when Jeanette was not there. Maleka reminded defendant of her grandmother's rule, but defendant came over anyway.

When defendant arrived, Maleka suggested they go to a nearby park. Defendant insisted on going into the house instead. Maleka relented and they went inside and sat on the couch in the living room. Before doing so, however, Maleka and defendant unlocked the side door to the house and defendant propped open the gate to the back fence with a rock so that he could leave quickly if Jeanette came home earlier than expected. This was not the first time Maleka had violated her grandmother's rule with defendant. While she and defendant had left the side door open to facilitate a quick exit before, this was the first time that defendant had propped the gate open with a rock.

While Maleka and defendant were sitting on the couch talking, defendant was texting someone on his phone. When Maleka asked who defendant was texting, he responded "nobody." Approximately five minutes later, defendant went to the bathroom. When he returned, he was speaking with someone on his cell phone. Ten minutes later, two young men rushed into the house through the side door. One of the men was skinny, wore a hoodie, and had a gun. The skinny man was later identified as Kevin Bullock.

The other man was larger, "like a football player," and wore a mask. He was later identified as Jalonji Hill.

Bullock pushed Maleka to the floor. Maleka considered making a move for the house phone to call 911, but Bullock prevented her from doing so. Meanwhile, Hill pushed defendant into the bathroom. Bullock then ordered Maleka to join defendant in the bathroom.

In the bathroom, Maleka reached for defendant's cell phone to call 911, but defendant would not let her make the call. Instead, defendant said that he wanted to call someone else. Defendant did call someone, but Maleka could not remember what defendant said to this person.

As they waited in the bathroom, Maleka could hear the robbers moving things around the house. Maleka asked defendant if he knew the robbers, and defendant responded that he did not. After a while, the sounds subsided, and Maleka and defendant emerged from the bathroom. Maleka grabbed a cordless phone to call 911 and went outside. She saw Hill, who had exited the house from the side door, running towards a faded black car with a television set. Maleka gave chase, and Hill dropped the TV near some road construction approximately one block away.

Defendant ran after Maleka, then passed her, and continued running after Hill. Maleka stopped at the construction site and told one of the construction workers that she had been robbed. She then walked back towards the house where the cordless phone signal was stronger. She called 911 from outside the house and told the operator what happened.

During the 10-minute conversation with the 911 dispatcher, Maleka was frequently overcome with emotion and unable to speak. On the audio recording of the 911 call, Maleka can be heard crying, screaming, and whimpering as the operator urges her to calm down. Despite her distress, she was able to recount many of the essential facts of the robbery. Among other things, she provided descriptions of the suspects,

3

explained that one was armed with a gun, offered a description of the gun, and described the robbers' getaway car and escape route, giving a partial license plate number for the car.

While Maleka was on the phone with the 911 operator, a concerned neighbor happened along and stopped to comfort her. The neighbor called Jeanette, who returned to the house. Jeanette found an identification card bearing Hill's name on the floor of her bedroom.

Detective Mike French of the Sacramento County Sheriff's Department interviewed Hill approximately one week later. During the interview, Hill indicated that defendant was responsible for planning the robbery.

Defendant was arrested and charged with home invasion robbery (§ 211; count one) and first degree residential burglary (§§ 459, 462, subd. (a), & 667.5, subd. (c)(21); count two). With respect to count one, the prosecution alleged that defendant acted in concert. (§ 213, subd. (a)(1)(A).) The prosecution also alleged that defendant had been convicted of a prior residential burglary, a strike offense. (§ 667, subds. (a)-(i).) Defendant entered a plea of not guilty and denied the special allegations.

Prior to trial, the prosecution moved in limine to admit the audio recording of the 911 call as a spontaneous declaration under Evidence Code section 1240. Defense counsel objected, stating, "It's a very emotional 9-1-1 call. She sounds quite traumatized in the call and goes on for minutes and minutes and minutes about having been robbed. She's screaming the whole time, blood-curdling screams. It's really something to listen to. [¶] I think that its prejudice outweighs any probative value in this case. [¶] The defense isn't that she wasn't robbed. The defense is that [defendant] wasn't involved in the robbery. [¶] I don't see how bringing her 9-1-1 call into evidence helps the People establish their case against [defendant]. All it does is unduly prejudice [defendant]."

The prosecutor responded, "It's a prior -- it's a statement closest to time to what happened. And I'm fairly certain that [defense counsel] will be cross-examining Ms.

4

Maleka Cummings and attacking her credibility, her version of events. [¶] The 9-1-1 call is a crystallization of her observations at that point in time just after the crime occurred. It is in some ways the best evidence of her observations at the time. [¶] So I understand [defense counsel's] defense is more nuanced than simply no offense occurred, but I'm required to prove that a robbery occurred still, and she describes how the robbery occurred. [¶] So I'm not sure how I can't put on evidence that is relevant to show that a robbery occurred."

The trial court observed, "What I don't know right now is the content of the 9-1-1 [call]. [¶] Is she describing the event itself? Is she giving descriptions or just screaming on the phone?" The prosecutor agreed to make the audio recording and a transcript of the 911 call available for the trial court's review. The trial court noted, "If she's -- I'll just say if she's describing the event or describing the persons, I would agree with [the prosecutor] that that would be something that's relevant."

The trial court revisited the prosecution's motion to admit the audio recording the next day, stating, "It is clear in listening to the 9-1-1 tape that the caller, who is the named victim in this case, Maleka, is still feeling the effects -- let me put it that way -- I'm putting it mildly -- of the robbery itself. She is very distraught and yelling. And it's very close in time. She's talking about just being robbed. [¶] It appears that it qualifies as a spontaneous statement under the Evidence Code." The trial court granted the motion to admit the audio recording of the 911 call.

During the jury trial, Maleka testified to the basic facts of the robbery, and corrected some inaccuracies in her earlier statements to the 911 operator.[2] The audio

---

[2] For example, Maleka told the 911 operator that she was alone when the robbers entered the house, in an attempt to avoid getting into trouble for breaking her grandmother's rule. Maleka also told the 911 operator that the robbers stole her graduation money; however, she found the money when she returned to the house later.

recording of the 911 call was played for jury and Maleka acknowledged that she was "confused" and "a little hysterical" at the time. Maleka also testified that, despite their close friendship, defendant never communicated with her again after the robbery. However, defendant's girlfriend contacted Maleka and begged her not to press charges.

Later, Hill testified that he was taking medication and did not remember anything about the day of the robbery. Hill also testified that he did not remember speaking with Detective French; however, after watching a video recording of his interview with Detective French, Hill acknowledged that he had been "convicted of a home invasion robbery in concert based on something that happened in this conversation with Detective French."

Following Hill's testimony, the parties stipulated that Bullock and Hill had both been convicted of home invasion robbery in concert of Maleka. (§ 213, subd. (a)(1)(A).) The parties also stipulated that defendant had been convicted of a prior residential burglary in 2011. (§ 667, subds. (a)-(i).)

During the trial, Detective French testified that he reviewed phone records showing that defendant and Hill repeatedly texted one another prior to the robbery. Among other things, Hill sent defendant a text instructing him to "unlock the door." Detective French also testified that defendant and Hill repeatedly telephoned one another on the day of the robbery.

Detective French testified that he retrieved video surveillance footage from a nearby convenience store. In the surveillance videos, defendant and Hill can be seen running together in the direction of the location of the getaway car. Detective French also testified that Hill identified defendant as the mastermind behind the robbery.

Defendant testified on his own behalf. He admitted that he knew Hill and Bullock, and acknowledged that both men (accompanied by a third) gave him a ride to Maleka's house on the day of the robbery. He also admitted that he propped the side door and gate open.

Defendant explained that he exchanged texts with Hill because he understood that Hill wanted to ask Maleka if she had any friends she could introduce him to. He denied knowing that Hill and Bullock planned to rob Maleka. He acknowledged that he recognized Hill and Bullock as soon as they entered the house, and claimed he tried to stop them from committing the crime.

Defendant acknowledged that he prevented Maleka from calling 911, but claimed he did not want to call the police because he had outstanding warrants. Defendant admitted he ran away from the crime scene, and even passed the fleeing Hill. He acknowledged that Maleka was "terrified," but explained that he did not attempt to contact her because he did not want to be involved. Defendant also admitted that he lied about "[e]verything pretty much" in a prearrest interview with Detective French.

Following a four-day trial, the jury found defendant guilty as charged, and found all of the special allegations to be true. Defendant waived a jury trial on the prior conviction allegation, which the trial court found to be true. The trial court also found that defendant had violated probation in the previous burglary case, case No. 12F00077.

In this case, defendant was sentenced to an aggregate term of 17 years in state prison as follows: count 1 – 17 years, consisting of the middle term of six years, doubled for the prior strike conviction (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), plus five years for the prior serious felony enhancement (§ 667, subd. (a)); and count 2 – eight years, consisting of the middle term of four years, doubled for the prior strike conviction (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), stayed pursuant to section 654. The trial court imposed a subordinate and concurrent term of four years (one-third the middle term) for the previous burglary conviction in case No. 12F00077.

## DISCUSSION

Defendant contends the trial court erred by allowing the prosecution to introduce into evidence the audio recording of Maleka's 911 call. He argues the recording should have been excluded pursuant to Evidence Code section 352 because it was not relevant to

7

any disputed issue at trial, and it was unduly prejudicial because it allowed the jury to hear how frightened Maleka was at the time of the incident. We find no error.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) As the plain language indicates, "[e]vidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167 (*Holford*).) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Defendant claims the audio recording of the 911 call was not probative of any disputed issue at trial. He emphasizes that he never denied the robbery occurred; he merely denied any involvement in the robbery. He observes that the audio recording does nothing to establish that he was involved in the crime, noting that "Maleka never told the dispatcher that [defendant] was with her at her house during the robbery." He also notes that the parties stipulated that Bullock and Hill had both been convicted of the home invasion robbery in concert of Maleka. (§ 213, subd. (a)(1)(A).)

Defendant fails to show that the trial court abused its discretion in finding that the audio recording of the 911 call had probative value. (Evid. Code, § 352.) Although defendant may not have planned to dispute the fact that a robbery occurred, the

8

prosecution was nevertheless required to prove all of the elements of the charged offense, including the fact of the robbery. (See *People v. Williams* (1988) 44 Cal.3d 883, 907, fn. 7.) The audio recording was probative of the circumstances surrounding the robbery, which were put in issue by defendant's not guilty plea. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 204 ["a defendant's plea of not guilty puts in issue all the elements of the charged offense"].)

Although the parties stipulated to the fact that Bullock and Hill had been convicted of home invasion robbery, they do not appear to have done so until the end of the first day of trial, after Maleka and Hill had both testified. There is nothing in the record to suggest that the parties had entered into any such stipulation at the time of the in limine hearing on the admissibility of the audio recording.[3] "We may assess the trial court's ruling only on the facts made known to it at the time it made that ruling. [Citations.]" (*People v. Hernandez* (1999) 71 Cal.App.4th 417, 425.) Here, the trial court could reasonably conclude, at the time of the pretrial hearing, that the audio recording would be relevant to prove the circumstances of the robbery.

Defendant contends that "any probative value of the 9-1-1 call was clearly outweighed by the potential for prejudice, undue consumption of time, and confusion it would create in the jury's mind." We have listened to the audio recording of the 911 call and conclude that the trial court did not abuse its discretion in finding that its probative value outweighed any prejudicial effect. As noted, the audio recording is probative of the circumstances surrounding the robbery. Additionally, while not argued by the defense, a juror could have doubted that Maleka was a real victim and thought instead that she was a

---

[3] During the in limine hearing, defense counsel argued, "The defense isn't that she wasn't robbed. The defense is that [defendant] wasn't involved in the robbery." Defense counsel's comments may have suggested a willingness to stipulate to the fact of the robbery, but do not amount to an evidentiary stipulation in and of themselves. (*People v. Friend* (2009) 47 Cal.4th 1, 84 [arguments of counsel are not evidence].)

coconspirator. She was close friends with defendant. She violated her grandmother's rules about visitors, and helped defendant unlock the door through which Hill and Bullock entered. The audio recording establishes Maleka as a victim of the crime, rather than a co-conspirator with defendant. Although Maleka's fear and distress are apparent, there is nothing particularly inflammatory about the recording. It could not have been shocking for the jury to learn that Maleka was frightened and upset after being robbed at gunpoint. Indeed, defendant himself acknowledged that she was "terrified." We find nothing about the audio recording to have presented a "substantial danger of undue prejudice." (Evid. Code, § 352; see *People v. Roybal* (1998) 19 Cal.4th 481, 517 [tapes of 911 call were not "highly inflammatory" despite the fact that they revealed that caller was upset].) Nor does defendant's claimed prejudice "substantially" outweigh the probative value of the recording. (*Holford*, *supra*, 203 Cal.App.4th at p. 167.) Further, we find nothing that would confuse the jury or result in an undue consumption of time. Accordingly, we conclude that the trial court did not abuse its discretion in impliedly finding that the probative value of the audio recording was not substantially outweighed by any prejudicial effect or other Evidence Code section 352 concern.

Even if assuming the trial court abused its discretion in admitting the audio recording, the error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] [the People must show the error to be harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [defendant must show it is reasonably probable he would have obtained a more favorable result].) Defendant would have been convicted even without the 911 recording. There was other compelling evidence that inculpated defendant.

Defendant acknowledged that Bullock and Hill gave him a ride to Maleka's house on the day of the robbery. He admitted that he propped the gate open after he and Maleka unlocked the side door, thereby allowing the robbers to enter the property and the house. There was also evidence that defendant exchanged text messages with Hill

10

immediately before the robbery, including one message in which Hill instructed him to "unlock the door." The jury saw video surveillance footage of defendant running from the scene of the crime in the same direction as Hill, and even passing Hill, and learned that Hill had identified defendant as the mastermind behind the crime. The jury also heard evidence that defendant failed to communicate with his close friend, Maleka, after the robbery and lied to Detective French about "[e]verything pretty much," thereby raising serious doubts as to his credibility. On this record, we conclude that any error was harmless under either standard.

## DISPOSITION

The judgment is affirmed.


         <u>   MURRAY   </u>, J.


We concur:


<u>  NICHOLSON  </u>, Acting P. J.


<u>  ROBIE    </u>, J.


11